**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**PRINCETON ECONOMIC INTERNATIONAL LTD., Princeton Global Management Ltd. and Martin A. Armstrong, Defendants.**

**Commodities Futures Trading Commission, Plaintiff,**

v.

**Princeton Economic International Ltd., Princeton Global Management Ltd. and Martin A. Armstrong, Defendants.**

Nos. 99 Civ. 9667, 99 Civ. 9669.

United States District Court, S.D. New York.

Jan. 26, 2000.

Carmen J. Lawrence, Dorothy Heyl Securities and Exchange Commission, New

York, NY, Andrew J. Geist, Eric M. Schmidt, David Rosenfeld, Helene T. Glotzer, Securities and Exchange Commission, Northeast Regional Office, New York, NY, for Securities and Exchange Commission.

Martin P. Unger, Blank Rome Tenzer Greenblatt, LLP, New York, NY, for Martin A. Armstrong.

## AMENDED OPINION AND ORDER

OWEN, District Judge.

On September 1, 1999, the United States Attorney's Office for the Southern District of New York, on charges flowing from alleged massive securities fraud, obtained a warrant to search the premises of Princeton Economics International ("PEI"). FBI agents executed that warrant and served grand jury subpoenas on the company's employees. The next day, the United States Attorney's Office obtained an order seizing the assets held in Princeton Global Management's account at Republic New York Securities Corporation.

On the morning of September 13, 1999, the United States Attorney's Office obtained an arrest warrant for defendant Martin Armstrong, who owns or controls all the Princeton and related entities. Armstrong surrendered at 4:30 p.m. that afternoon.

Later that same day, September 13, 1999, at approximately 5:00 p.m., the SEC and the CFTC went before Judge Kaplan of this Court for a freeze order, temporary receivership, and other interim relief. Judge Kaplan granted a Temporary Restraining Order, providing, among other things, that the defendants and their "officers, agents, servants, employees, [and] attorneys" were to "hold and retain within their control, and otherwise prevent any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal of any assets, funds or other properties ... of Defendants currently held by them or under their control, whether held in their names or for any of their direct or indirect beneficial interest." (TRO of Sept. 13, 1999 ¶ IX). The order specifically exempted "reasonable attorney's fees not to exceed $10,000." The TRO also established a Temporary Receivership and gave the Receiver authority to "take and retain immediate possession, custody, and control of all assets and property" of the Corporate Defendants, and "to manage, control, operate and maintain their businesses" and "commence, maintain, defend or participate in legal proceedings" on their behalf. (Id. ¶¶ X.A, X.D).

Between the execution of the search warrant and issuance of subpoenas on September 1, 1999, and the entry of the TRO on September 13, 1999, Armstrong retained at least three law firms to represent him individually in connection with civil and criminal matters arising from the government investigation. To pay for this, Armstrong had his corporations, PEI and the Princeton Economic Institute ("Institute"), entities later covered by the TRO and its freeze order, to pay over $1.3 million to accounts held in the names of his attorneys at Tenzer Greenblatt ("TG"), Pellettieri, Rabstein & Altman ("PR & A"), and Durant & Durant ("D & D").

As to TG, on September 2, 1999, Armstrong executed a retainer agreement with TG. TG agreed to represent Armstrong "in connection with a pending federal grand jury investigation, and related governmental investigations." The agreement sets forth TG's hourly rates and requires Armstrong to pay for all additional costs and disbursements. Although the agreement provides for a "retainer" of $100,000, it also provides that monthly invoices for services rendered are due upon receipt, and that interest will accrue if any part of an invoice remains unpaid for a period of thirty days or more. On September 3, 1999, the Institute transferred $100,000 to TG's operating account at the Chase Manhattan Bank.

As to PR & A, On September 9, 1999, Armstrong executed a retainer agreement

with PR & A. This agreement set forth an hourly rate of $300 for all attorneys and provided that Armstrong would pay PR & A a "minimum fee" of $100,000. The agreement authorized Marc Durant, Esq., to convey $100,000 to PR & A to cover this minimum, which it did with monies Armstrong had had his affiliated corporation, the Institute, transfer first to D & D. *See infra* p. 5. The agreement provided, however, that "if you choose to discontinue our services prior to completion of your matter, any unearned portion of the minimum fee (less out-of pocket expenses) shall be returned to you." On September 10, 1999, Armstrong and PR & A entered into a "supplemental agreement regarding legal representation in connection with both potential criminal and civil proceedings." This agreement, which was "incorporated and made a part" of the agreement dated September 9, 1999, purported to cover a potential action against Republic Securities and the representation of various corporate entities in which Armstrong held a direct or indirect interest, including PEI. This agreement also set forth an hourly attorney rate of $300 and required Armstrong to pay separately for certain fees and disbursements, but called for a "minimum fee" of $750,000. Like the earlier agreement, it contained the caveat that "if you choose to discontinue our services prior to completion of your matter, any unearned portion of the minimum fee (less out-of-pocket expenses) shall be returned to you."

On September 13, 1999, $741,000 was transferred from a PEI account at Citibank to PR & A. This PR & A put in a trust account. On that same day, Armstrong also directed that an additional $2 million be transferred from the same account to PR & A. The latter transfer was not accomplished, however, because the TRO had become effective, and the bank, on notice of the freeze order, declined to honor Armstrong's instructions. On September 14, 1999, Richard Altman, a partner of PR & A, personally effected a transfer of $741,000 from PR & A's trust account into its attorney business account.

As to D & D, on September 8, 1999, Armstrong and D & D executed a written fee agreement concerning D & D's representation of Armstrong "in connection with a federal criminal investigation concerning [PEI], Republic New York Securities, and other likely entities." This agreement sets forth the hourly rates of D & D attorneys and staff and notes that Armstrong will also be responsible for costs and expenses. The agreement specifically provides that "[t]here will be no minimal fee or non-refundable retainer. All retainer payments (less our accrued time charges) are refundable if this case or our representation ends or our invoices do not exceed such amounts."

On September 14, 1999, one day after the freeze order, Armstrong and D & D executed another document modifying the September 8 agreement. Given new developments since the initial agreement, the new agreement professed that the scope, complexity, and seriousness of the matter now required minimum payment of $100,-000. However, it also noted that upon termination of the representation "prior to completion of this matter, any unearned portion of the minimum fee (less accrued time and out-of-pocket expenses) will be returned to you."

The monies for this came from Armstrong's affiliated corporation, the Institute,[1] from which D & D's received $510,00 in two installments, the first a $10,000 check dated September 3, 1999, and the second a wire transfer of $500,000 on September 7, 1999. D & D placed these funds in its trust account. To pay for "Institute employees who retained counsel," D & D transferred $100,000 to PR & A, and a total of $20,000 to other lawyers. D & D

---

**1.** The Institute raised a question as to its affiliation, resolved affirmatively by this Court in its Memorandum of October 18, 1999.

has retained the remaining $390,000, and transferred the following amounts to its fee/operating accounts: (a) $21,705.75 on September 14, 1999; (b) $10,000 on September 22, 1999; and (c) $63,000 on September 23, 1999.

On October 12, 1999, I addressed the attorney fees issues. On that date, I froze $991,000 of the $1,351,000 that Armstrong had caused PEI and the Institute to transfer to the three law firms. I permitted the law firms to keep the remaining portion of the funds ($100,000 for TG, $140,000 for PR & A, and $100,000 for D & D), without prejudice to an application by the Receiver to recover these funds as well. On December 15, 1999, the Receiver did make a follow-up motion for the turn-over of all funds transferred as attorney retainers, including the amount the court permitted the attorneys to hold. The three law firms oppose this motion, and in the alternative, PR & A cross moves for recovery in quantum meruit. For the reasons set forth below, the Receiver's motion is granted in its entirety, and the cross-motion is denied.

On September 13, 1999 the TRO froze all assets, including monies and funds, owned or controlled by the all of the defendants, and granted the Receiver total authority to manage and control the corporate defendants and their related entities, including the institution and maintenance of legal proceedings on their behalf. Moreover, the TRO required all Enjoined Parties, which includes the three law firms, to transfer all assets of the Corporate Defendants within their control or custody.

■ It is clear that any funds held in an attorney's trust account remained the property of the payor. *See Gala Enters., Inc. v. Hewlett Packard Co.*, 970 F.Supp. 212, 217 (S.D.N.Y.1997) ("As a general matter, funds kept in an escrow account, such as an [attorney trust account], are funds of the client held by the attorney in his fiduciary capacity."). On September 13, at the hour of the signing of the freeze order, PR & A held $741,000 in its trust account and D & D held $390,000 in its trust account. Therefore, this money was subject to the TRO, the attorneys were custodians of assets of the corporate defendants, and they were required to turn over these assets to the Receiver. Neither did so. Moreover, Altman, acting in what another court viewed as civil contempt, regardless of intention, transferred the $741,000 to his firm's fee account on September 14, the day after the TRO had been entered. *See S.E.C. v. Comcoa, Ltd.*, 887 F.Supp. 1521, 1527–28 (S.D.Fla.), *aff'd*, 70 F.3d 1191 (11th Cir.1995). PR & A claims that its bookkeeper erred in depositing it into the trust account upon receipt and that the funds were never intended to go into that account is of no relevance. *Id.* at 1527 ("[E]ven if [the attorney] believed, in good faith, that it held legal title to the funds at issue, and that its transfer of the funds was not in violation of the Court's orders, such belief does not protect [him] from a finding of contempt."). Also on September 14, D & D and Armstrong executed an amended fee agreement requiring a minimum $100,000 fee. This agreement, executed *after* the TRO, can not change the character of funds in the trust account because *they had been frozen on the previous day.* Thus, PR & A and D & D can not retain the funds transferred by PEI and the Institute for the representation of Armstrong.

■ Lastly, in this highly publicized securities fraud case, the attorneys either knew, or should have known that the monies received from alleged corporate malactors to pay the CEO's lawyers could be subject to forfeiture. "[L]awyers who receive a conveyance under circumstances that should cause them to inquire into the reasons behind the conveyance must diligently do so, lest they be charged with knowledge of any intent on the part of transferor to hinder, delay, or defraud. A lawyer who blindly accepts fees from a client under circumstances that would cause a reasonable lawyer to question the client's intent in paying the fees accepts

the fees at his peril." *Gala Enters., Inc. v. Hewlett Packard Co.,* 989 F.Supp. 525, 532 (S.D.N.Y.1998). Here, I find the circumstanced requires all the firms to inquire further. They were hired to represent Martin Armstrong individually, yet the retainers came from PEI and the Institute. All the law firms were aware of the nature of the government's investigations into Armstrong's business dealings, and therefore, at the very least, in addition to knowing they were not being paid by the client, should have been aware of the possibility that they were being paid with corporate funds obtained by fraud. Indeed, PR & A admitted in both its papers and oral argument that due to concerns about the source of the funds, it attempted to craft an agreement that would prevent the SEC, CFTC, and creditors from reaching the funds. The three firms, therefore, accepted the funds at their own risk, and now must return them, as Armstrong may not use funds obtained by fraud to pay for his defense. *S.E.C. v. Quinn,* 997 F.2d 287, 289 (7th Cir.1993) ("[A] swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime."). Thus, none of the firms, including TG, may retain the funds received directly or indirectly from PEI and the Institute for Armstrong's representation.

Accordingly, the law firms are ordered to turn over within 15 days to the Receiver all funds received from PEI and the Institute, particularly, (1) TG must turn over $100,000; (2) PR & A must turn over $841,000; and (3) D & D must turn over $390,000. PR & A's motion for recovery in quantum meruit is denied, as Armstrong, not the Receiver or the corporate entities, is the proper party to which to address payment for benefits conferred, as he is the client.

So ordered.